

FILED

2:27 pm, 8/26/22

**Margaret Botkins**
**Clerk of Court**

Scott E. Ortiz, WSB No. 5-2550
William E. Reese, WSB No. 7-4898
Alia T. Scott, WSB No. 7-5703
WILLIAMS, PORTER, DAY, & NEVILLE P.C.
PO Box 10700
Casper, WY 82602
Phone: 307-265-0700
Fax: 307-266-2306
Email:  sortiz@wpdn.net
        wreese@wpdn.net
        ascott@wpdn.net

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| TRUE OIL LLC, a Wyoming Limited<br>Liability Company, AND<br>TRUE RANCHES LLC, a Wyoming<br>Limited Liability Company,<br><br>    Plaintiffs,<br><br>v.<br><br>THE BUREAU OF LAND MANAGEMENT,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)   CV 2022- 22-cv-188-KHR<br>)<br>)<br>)<br>)<br>)<br>) |

---

### COMPLAINT FOR DECLARATORY JUDGMENT

---

**COME NOW**, True Oil LLC, a Wyoming Limited Liability Company, and True Ranches

LLC, a Wyoming Limited Liability Company (hereinafter referred by to individually by name

"True Oil" and "True Ranches" or jointly as "Plaintiffs"), by and through its undersigned counsel

of Williams, Porter, Day & Neville, P.C., for the cause of action of a declaratory judgment pursuant

to 28 U.S.C.A. § 2201, for and against the Bureau of Land Management ("BLM"); and respectfully

request this Court issue an Order (1) declaring the rights and other legal relations of the Plaintiffs

under existing split estate common law and regulatory statutes, and (2) declaring that it is True

Oil's right to drill a traversing well through the Federal Tract belonging to the BLM without leave from the BLM, as True Ranches, the surface owner, has agreed to grant True Oil a subsurface easement to drill through True Ranches' subsurface structures to access True Oil's fee minerals within the adjacent tract.

## I. THE PARTIES, JURISDICTION & VENUE

1.      Plaintiff, True Oil LLC, is a Wyoming Limited Liability Company with a principal business address of 455 N. Poplar Street, Casper, WY 82601.

2.      True Oil LLC owns the minerals located under Section10:NW4 & S/2 in Laramie County, Wyoming, within the Codell formation in a stand up 1028-acre drilling and spacing unit.

3.      True Ranches LLC, is a Wyoming Limited Liability Company with a principal business address of 455 N. Poplar Street, Casper, WY 82601.

4.      True Ranches LLC owns the surface estate overlaying Sec.10: All and Section15: Lots 1-4, N2S2, N2, T12N, R65W, located in Laramie County, Wyoming.

5.      Defendant, the Bureau of Land Management, is a federal agency within the United States Department of the Interior, which is focused on managing approximately thirty percent of the Nation's minerals.

6.      The BLM owns a 160 acre tract of federal minerals associated with federal lease WYW-186666 located underneath Section 10:NE4 in Laramie County, Wyoming (the "Federal Tract").

7.      This Court has jurisdiction over this case under 28 U.S.C. § 1332(a), as complete diversity exists between Plaintiffs and Defendant, and damages associated with, and stemming from, the underlying matter in controversy exceeds the sum of $75,000.00.

8.      In addition, this Complaint for Declaratory Judgment and the requested relief is

brought pursuant to 28 U.S.C.A. § 2201, which provides that, in a case of actual controversy within its jurisdiction, the Federal District Court, upon the filing of appropriate pleadings, has jurisdiction over the question presented, and requested relief, and may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. 28 U.S.C.A. § 2201.

9.      Pursuant to 28 U.S.C.A. § 1391(b), venue is proper in this Court, as a substantial part of the events and omissions giving rise to this controversy and need for judicial interpretation occurred and are occurring in Laramie County, Wyoming. Further, the property that is subject to this action is situate in Laramie County, Wyoming.

## II.     FACTUAL BACKGROUND

10.     True Oil is preparing to drill, complete, and operate up to four horizontal Codell formation wells in a standup 1028-acre drilling and spacing unit ("DSU") comprised of Sec.10: NW4, S2  and Sec.15: Lots 1-4, N2S2, N2, T12N, R65W, Laramie County, Wyoming.

11.     The entire DSU consists of fee minerals.

12.     True Oil owns the minerals under Sec.10: NW4, S2. Cowboy Land, LLC owns the minerals under Sec.15: Lots 1-4, N2S2, N2, and have leased these minerals to Anadarko Oil & Gas 5, LLC.

13.     Attached hereto as **Exhibit A** and incorporated herein by reference is a true and accurate copy of the Deed evidencing True Oil's mineral ownership. **TRUE-000001-3.**

14.     The entire surface estate overlaying the entire DSU and Sec. 10:NE4 is owned by True Ranches.

15.     Attached hereto as **Exhibit B** and incorporated herein by reference is a true and accurate copy of the Deed evidencing True Ranches surface estate ownership. **TRUE-000004.**

16.    In order to access and produce its fee minerals to the south of the Federal Tract, True Oil intends to drill up to four (4) horizontal wells in a North-South orientation from a single pad located in Sec. 10: NENW pursuant to applications for permit to drill ("APD") from the Wyoming Oil and Gas Conservation Commission ("WOGCC").

17.    It will be necessary for one or two of these horizontal wells to traverse—but not complete or perforate within—the subsurface formations of the above-described Federal Tract.

18.    True Oil is currently negotiating a certain *Subsurface Easement Agreement* with True Ranches granting True Oil the right to access and traverse its subsurface geologic formations which underlie its surface lands.

19.    In accordance with its drilling plan, True Oil will not complete any portion of the traversing wellbore(s) within the Federal Tract, and has no intention of doing so in the future.

20.    On or about April 27, 2021, True Oil learned that the mineral lease associated with the Federal Tract was subject to litigation in one or more of the following three cases: *Mont. Wildlife Fedn. v. Bernhardt*, 2022 U.S. Dist. LEXIS 44080 (March 11, 2022); *W. Watersheds Project v. Zinke*, 441 F. Supp. 3d 1042 (D. Idaho 2020); *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41 (D. D.C. 2019).

21.    Because True Oil's drilling plan necessarily involves a portion of the federal interests subject to the aforementioned litigation, True Oil contacted the interested BLM field offices regarding its plan to produce the adjacent fee minerals within the DSU pursuant to a state of Wyoming APD.

22.    In March and April 2022, True Oil and True Ranches had numerous telephone and email correspondences with the BLM Rawlins Field Office wherein the parties discussed True Oil's drilling plan and the applicable regulatory issues that may be associated with traversing

wellbores.

23.     On April 8, 2022, a BLM field personnel from the Rawlins Field Office initiated a phone conference between the BLM, True Oil and True Ranches to provide Plaintiffs with a summary and conclusion of internal discussions with local and national BLM officials regarding True Oil's plan to traverse the Federal Tract.

24.     During this call, the Rawlins Field Office stated that certain BLM petroleum engineers had taken the position that in order to traverse the subject Federal Tract, True Oil would be required to first obtain a federal APD.

25.     In-house legal counsel for True Oil and True Ranches disagreed with the BLM Rawlins Field Office's conclusion, expressed concern about the legal basis for this conclusion, and identified several legal conflicts regarding the surface owner's rights below the surface and BLM's authority as provided by law.

26.     On April 28, 2022, as requested by the Rawlins Field Office, in-house counsel for Plaintiffs provided the BLM with a legal memorandum briefing the relevant law on the issue of surface owner's rights below the surface and the purported requirement of obtaining a federal APD prior to True Oil traversing the Federal Tract.

27.     Attached hereto as **Exhibit C** and incorporated herein by reference is a true and accurate copy of the Legal Memorandum. **TRUE-000005-14.**

28.     On June 2, 2022, representatives from True Oil, Mustang Energy Resources, LLC, and the BLM Rawlins Field Office participated in a conference call to discuss True Oil's intent to traverse, but not produce from, the Federal Tract associated with the federal lease WYW-186666.

29.     On June 16, 2022, John R. Elliott, the acting Rawlings Field Manager for the BLM Rawlins Field Office, issued a written response to True Oil's request ("BLM Response").

30.     Attached hereto as **Exhibit D** and incorporated herein by reference is the Rawlins Field Office's response letter. **TRUE-000015-16.**

31.     In its response, the BLM concluded that it "cannot authorize the request to traverse WYW-186666 if the traversing borehole could be considered to provide for subsequent development of the lease unless Judge Morris has approved such activity pursuant to a filed motion." EX. D., p. 1.

## III.     LEGAL QUESTION PRESENTED

32.     Plaintiffs, by this reference, do hereby incorporate the preceding paragraphs of this *Complaint* as if fully set forth herein.

33.     The legal issue, and question presented to this Court for interpretation is:

> Whether True Oil is entitled to drill a traversing well through the Federal Tract without leave from the BLM, (1) wherein the BLM is the mineral owner, or (2) in the BLM's capacity as a regulatory body, where the surface owner has granted True Oil a subsurface easement to drill through its subsurface structures to access fee minerals within the adjacent tract.

## IV.     CONTROLLING LEGAL PRINCIPLES

34.     Plaintiffs, by this reference, do hereby incorporate the preceding paragraphs of this *Complaint* as if fully set forth herein.

### A. *Property rights allocated between the surface and mineral estates in split estates.*

35.     The DSU that is the subject of this matter is comprised of, and consist of several split-estate tracts.

36.     Split-estate tracts indicate that the legal rights to the mineral interests have been severed from the legal rights to the surface of the estate. *Ohio Oil Co. v. Wyoming Agency*, 179 P.2d 773, 778 (Wyo. 1947).

37.     Upon severance of the estates, the mineral estate's existence is separate and apart

from the surface estate and its associated existence. The severance between these estates creates two separate estates, both of which are mutually dominant and servient, and each constitutes a freehold estate that is separate and independent from the other. *Moorcroft v. Lang*, 779 P.2d 1180 (Wyo. 1989) (*citing Ohio Oil Co.*, 179 P.2d at 778.)

38.    The foregoing applicable rights and interests of split-estates are applicable in this matter hereunder review in that the subject DSU consists of several divided mineral estates with various owners and a single surface estate owned by True Ranches.

39.    In Wyoming, simultaneous use of different interests tied to and associated with the same real property is common. *Ecosystem Res., L.C. v. Broadbent Land & Res., LLC*, 158 P.3d 685, 692 (Wyo. 2007).

40.    It is generally recognized that the owner of real property enjoys the right to exclude all others from the use of the property. *Lightning Oil Co. v. Anadarko E&P Onshore, L.L.C (Lightning Oil IV)*, 520 S.W.3d 39, 49 (Tex. 2017). In the specific context of split-estates, each owner's right to exclude is dictated by the scope of that owner's rights to the property at issue. *Id.*

41.    Because surface, subsurface, and mineral rights are highly interconnected, each interest owner's right to exclude the other within the same tract is necessarily limited to protect each owner's right to make reasonable use of said owner's property. *See Mingo Oil Producer v. Kamp Cattle Co.*, 776 P.2d 736, 742 (Wyo. 1989); *Ecosystem Res.*, 158 P.3d at 692.

*i.    The mineral estate and the mineral owner's rights.*

42.    An interest in a mineral estate, is "an estate in fee simple in and to the minerals." *Smith v. B&G Royalties*, 469 P.3d 1206 (Wyo. 2020) (quoting *Picard v. Richards*, 366 P.2d 119, 123 (Wyo. 1961)).

43.    "A conveyance or reservation of a mineral fee gives title to the minerals in place."

*Id.*

44.     Mineral estate ownership consists of five essential interests: the right to develop the minerals, the right to lease the minerals, the right to receive royalty payments, the right to receive delay rentals, and the right to receive bonus payments. *See Smith*, 469 P.3d at 1214 n.8; *Picard*, 366 P.2d at 123 (holding that the ownership of an unrestricted mineral interest includes all the incidents of ownership, some of which are the right to execute oil, gas and mineral leases and the right to receive bonuses, rentals and royalties.); *Lightning Oil IV,* 520 S.W.3d at 49.

45.     In the context of mineral estates, the right to develop has been described as "the exclusive right to possess, use, and appropriate gas and oil; the exclusive right to appropriate [the minerals] to any extent desired by the grantee and his assigns; the exclusive right to conduct operations to mine, store, and transport [the minerals]; and the exclusive right to prospect for, produce, and dispose of the minerals." *Id.* (quoting *Stephens County v. Mid-Kansas Oil & Gas Co.*, 254 S.W. 290, 293–94 (Tex. 1923) (alterations in original) (internal quotations omitted).

46.     In general, when an operator enters into an oil and gas lease with a mineral owner, the operator is granted only the right to develop the minerals under the lease. *Id.*

47.     For the purposes of this *Complaint*, any reference to the "mineral owner" necessarily includes any valid lessee to which the owner of the mineral estate has granted its right to develop its minerals.

48.     As an essential element of the right to develop the mineral estate, the Wyoming Supreme Court recognizes the well-settled split estate premise that the mineral owner, "insofar as the surface of land is concerned, possesses the dominant estate, and the lessor, or surface owner, has the servient estate." *Mingo Oil*, 776 P.2d at 742.

49.     Under the rules of duel possession, the mineral owner, "as the owner of the

dominant estate, has the right to the use and possession of so much of the surface as is reasonably required in the operation of his mineral lease." *Id.* (quoting *Getty Oil Company v. Royal*, 422 S.W.2d 591, 593 (Tex. App. 1967)).

50.    As such, the mineral owner "is entitled to use so much of the leased premises as is required in its lease operations reasonably necessary for development and exploration, and that the surface owner has the right to use the portion of the surface not so required by the mineral lessee." *Id.* (*quoting Getty Oil*, 422 S.W.2d at 593).

51.    The Wyoming Supreme Court has refined these split-estate principals to specifically address dual possession questions in the context of the production of oil and gas. "Under the rule of reasonable necessity, a mineral lessee is entitled to possess that portion of the surface estate 'reasonably necessary' to the production and storage of the mineral." *Mingo Oil*, 776 P.2d at 741 (quoting *Sanford v. Arjay Oil Co.*, 686 P.2d 566, 572 (Wyo. 1984)).

52.    "The true rule is that under the ordinary oil and gas lease, the lessee, in developing the premises in the production of oil and gas, is entitled to the possession and use of all that part of the leased premises which is reasonably necessary in producing and saving the oil and gas." *Id.* (quoting *Pure Oil Co. v. Gear*, 83 P.2d 389, 392 (Okla. 1938)). "This extends to space required upon which to erect tanks or dig pits necessary to store or confine such refuse matter as may come from the wells on the leased premises in the course of ordinary prudent operations." *Id.*

### ii.    *The surface estate and the surface owner's rights.*

53.    "While the mineral estate is dominant, as explained above, the rights of a surface owner are in many ways more extensive than those of the mineral lessee." *Lightning Oil IV*, 520 S.W.3d at 48 (citing *Coastal Oil & Gas Corp. v. Garza Energy Tr.*, 268 S.W.3d 1, 11 (Tex. 2008)).

54.    While preserving the mineral owner's right to make reasonable use of the surface

to develop its interest, Wyoming law also extends a surface owner "the right to prevent unreasonable use of the surface by a mineral owner so that the surface owner is afforded an opportunity to protect his interests in advance of any development by the mineral owner." *Id.*; *WYMO Fuels v. Edwards*, 723 P.2d 1230 (Wyo. 1986); *see also* WYO. STAT. ANN. § 30-5-406; §§ 35-11-406(b)(x)–(xii), -416.

55.    Just as the mineral owner enjoys certain rights on the surface after severance of the estates, the surface owner retains certain rights below the surface. Namely, once the mineral interests have been severed from a particular surface estate, the surface owner retains ownership and control over the subsurface geologic formations existing below the surface. *Lightning Oil IV*, 520 S.W.3d at 44 (citing *Lightning Oil Co. v. Anadarko E&P Onshore LLC (Lightning Oil III)*, 480 S.W.3d 628, 635–36 (Tex. App. 2015)); *XTO Energy, Inc. v. Goodwin*, 584 S.W.3d 481, 487 (Tex. App 2017) (citing *Humble Oil & Refining Co. v. West*, 508 S.W.2d 812, 815 (Tex. 1974) (holding that the surface overlying a leased mineral estate is the surface owner's property, and those ownership rights include the geological structures beneath the surface).

56.    As such, the "surface owner, not the mineral owner, owns all non-mineral molecules of the land, i.e., the mass that undergirds the surface estate." *XTO* Energy, 584 S.W.3d at 487 (citing *Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 630 F.3d 431, 442 (5th Cir. 2011) (internal quotations omitted).

57.    Although the mineral owner is entitled to make the same reasonable use of subsurface geologic structures to develop its interest as it does the surface, mineral ownership applies only to the fugacious materials therein. *See XTO* Energy, 584 S.W.3d at 487 (holding that although the surface owner retains ownership and control of the subsurface materials, a mineral lessee owns a property interest . . . in the oil and gas in place in the subsurface materials).

58.    More specifically, "absent the grant of a right to control the subterranean structures in which the oil and gas molecules are held, the mineral estate owner does not control the subsurface mass and is only entitled to 'a fair chance to recover the oil and gas' from its mineral estate." *Lightning Oil IV*, 520 S.W.3d at 44 (citing *Lightning Oil III*, 480 S.W.3d at 635–36 (quoting *Coastal Oil & Gas Corp. v. Garza Energy Tr.*, 268 S.W.3d 1, 15 (Tex. 2008))).

**B. True Oil is permitted to traverse the Federal Tract as a matter of law without leave from the BLM wherein the BLM is the mineral owner.**

59.    The specific legal issues and question presented herein, are a case of first impression in Wyoming and in front of this Court.

60.    In general, Wyoming law remains largely silent on the issue of a *surface owner's* subsurface rights in the context of split estates, and a nationwide review of state and federal case law reveals only one line of cases out of Texas which address traversing wells and the relevant legal questions addressed herein. *See Lightning Oil Co. v. Anadarko E&P Onshore, LLC (Lightning Oil IV)*, 520 S.W.3d 39 (Tex. 2017), *aff'g Lightning Oil Co. v. Anadarko E&P Onshore LLC (Lightning Oil III)*, 480 S.W.3d 628 (Tex. App. 2015).

61.    The Texas Supreme Court's decision in *Lightning IV* is highly relevant and should serve as the basis for future trial courts' decisions. *See Taylor v. Schukei Family Trust*, 996 P.2d 13 (Wyo. 2000) (citing *State ex rel. Wyoming Workers' Safety and Compensation Div. v. Sparks*, 973 P.2d 507, 510 (Wyo. 1999) (finding that the decisions of other state and federal courts are persuasive authority in considering an issue of first impression)).

62.    In *Lightning Oil IV*, Anadarko E&P Onshore, LLC ("*Anadarko*") and Lightning Oil Co. ("*Lightning*") each owned a valid mineral lease on two adjacent tracts. *Lightning Oil IV*, 520 S.W.3d at 43; *Lightning Oil III*, 480 S.W.3d at 630–31. The surface estate overlying Anadarko's lease ("*Tract A*") was owned by the Texas Parks and Wildlife Department and the surface estate

overlying Lightning's lease ("*Tract B*") was owned by Briscoe Ranch, Inc. ("*Briscoe Ranch*").
*Lightning Oil III*, 480 S.W.3d at 630–32. Anadarko's lease required the use of off-site drilling
locations "when prudent and feasible," thus Anadarko sought to access and produce its minerals
under Tract A by drilling traversing wells from the surface of Tract B. *Lightning Oil IV*, 520
S.W.3d at 43.

63.     Anadarko entered into a *Surface Use and Subsurface Easement Agreement* with
Briscoe Ranch to drill one or more horizontal wells from various well locations on the surface of
Tract B, which would then traverse subsurface portions of Tract B before entering into Tract A
deep below the surface. *Id.*; *Lightning Oil III*, 480 S.W.3d at 631. At trial, Anadarko emphasized
that it had no intention "to perforate in or produce minerals from Lightning's leasehold," and
affirmed its intention to comply with all applicable state and local rules in its operations. *Lightning
Oil IV*, 520 S.W.3d at 43.

64.     After Anadarko notified Lightning of its drilling plan and proposed well sites,
Lightning filed suit against Anadarko, asserting trespass claims and tortious interference with
contract. *Id.* at 44; *Lightning Oil III*, 480 S.W.3d at 632. Lightning also asked the court for an
injunction to prevent Anadarko's wellbores from traversing its minerals and for a declaratory
judgment finding that Briscoe Ranch had no right to permit Anadarko to do so. *Lightning Oil III*,
480 S.W.3d at 632–33.

65.     Before trial, Lightning and Anadarko filed competing motions for summary
judgment as to Lightning's trespass claims, its request for injunctive relief, and whether the surface
owner could authorize subsurface activities without Lightning's consent. *Lightning Oil IV*, 520
S.W.3d at 44. The trial court granted summary judgment in favor of Anadarko and dismissed all
of Lightning's claims. *Id.*

66.     After losing its first appeal in the Fourth District of the Texas Court of Appeals, Lightning appealed to the Texas Supreme Court. *See Id.* at 43. In a thorough and decisive opinion, which in pertinent part is summarized below, the Texas Supreme Court affirmed the appellate court's decision to uphold trial court's judgment in favor of Anadarko. *Lightning Oil IV,* 520 S.W.3d at 43–53, *aff'g Lightning Oil III*, 480 S.W.3d 628.

67.     Rejecting essentially all of Lightning's arguments for its trespass claims, the Texas Supreme Court ultimately held, Lightning, as mineral lessee, does not own nor exclusively control the subsurface geologic formations and materials surrounding any hydrocarbon molecules within the mineral lease boundaries. As such, Anadarko's actions did not constitute a trespass, as Lightning had no right to exclude Anadarko's operations, or otherwise interfere with its drilling plan. *See Lightning Oil IV,* 520 S.W.3d at 45–51.

68.     The disputes presented in *Lighting Oil III* and *IV* are based on substantially similar underlying facts, thus the outcomes and analysis in  in those cases serve as persuasive authority for determining the rights of the Parties in the present matter. *See Sparks*, 973 P.2d at 510.

69.     The following analyzes the holdings provided by the Texas Supreme Court and the Texas Court of Appeals in the *Lightning Oil* appeals, which further defines the split-estate property rights allocated between the surface and mineral estate, and clarifies the scope of a mineral owner's right to exclude below the surface:

### i.   *No Subsurface Trespass.*

70.     Lightning's core argument in support of its trespass claim at trial and on appeal was that it has the right to exclude Anadarko from traversing the tract:

> As the leaseholder of the mineral estate, Lightning asserts it has the right to exclude others from drilling. It contends it has the exclusive right to determine who can drill through the earth and the oil and gas

within the boundaries circumscribing the Cutlass Lease. Lightning insists that Briscoe Ranch's permission is not enough . . .

*Lightning Oil III*, 480 S.W.3d at 631.

> [Lightning] contends Texas law firmly establishes that the dominant mineral estate has the right to exclude those seeking to pass through it and to hold otherwise will transform the absolute ownership rights of a mineral owner or lessee in oil and gas in place into a mere license to hunt for the minerals.

*Lightning Oil IV,* 520 S.W.3d at 44.

> Lightning does not argue that Briscoe, as surface owner, owns and controls the subsurface of the Ranch completely subject to Lightning's lease and the dominant nature of the lease. Rather, Lightning's claims for both trespass and tortious interference with contract turn on **whether a lessee's rights in the mineral estate include the right to preclude a surface owner or an adjacent lessee's activities that are not intended to capture the lessee's minerals,** *but rather are intended only to traverse, or bore through, the formations in which the lessee's minerals are located.*

*Id.* at 45–46 (emphasis added).

71.    Relying on three critical legal principles of property ownership, the appellate court concluded that "**Lightning does not have the right to exclude Anadarko's operations** because it 'does not own or exclusively control the earth surrounding any hydrocarbon molecules that may lie within the boundaries of the Cutlass Lease.'" *Id.* at 47–48 (quoting *Lightning Oil III*, 480 S.W.3d at 635–36) (emphasis added).

72.    In support of its conclusion, the court of appeals noted the three crucial holdings from prior Texas cases:

> First, . . . in *Humble Oil & Refining Co. v. West,* we held that the surface overlying a leased mineral estate is the surface owner's property, and those ownership rights include the geological structures beneath the surface. Second, the court [of appeals] pointed to a Fifth Circuit case applying Texas law, in which that court concluded that the surface owner, and not the mineral owner, "owns all non-mineral 'molecules' of the land, i.e., the mass that

> undergirds the surface" estate. Third, the court relied on our holding
> in *Coastal Oil*… in which we held that the mineral estate owner is
> only entitled to "a fair chance to recover the oil and gas in place or
> under" the surface estate.

*Id.* at 46–47 (internal citations omitted) (quoting *Lightning Oil III*, 480 S.W.3d at 635 (citing 508

S.W.2d 812, 815 (Tex. 1974); *Dunn—McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 630

F.3d 431, 441 (5th Cir. 2011); *Coastal Oil & Gas Corp. v. Garza Energy Tr.*, 268 S.W.3d 1, 15

(Tex. 2008))).

    73.    In support of its trespass claim, Lightning cited an earlier case from the Texas

Supreme Court addressing an ongoing trespass by an adjacent mineral owner. *Lightning Oil III*,

480 S.W.3d at 634 (citing *Hastings Oil Co. v. Tex. Co.*, 234 S.W.2d 389, 398 (Tex. 1950)).

> Lightning argues that *Hastings* supports Lightning's view that it
> may bar Anadarko from drilling through the earth containing
> Lightning's mineral estate. In *Hastings*, the Texas Supreme Court
> determined that a trespass may occur where an adjacent mineral
> estate's well bottoms in the plaintiff's mineral estate.

*Id.* (citing *Hastings Oil*, 234 S.W.2d at 398).

    74.    The court held that that the *Hastings* case did not apply to the *Lightning Oil III* case

because Anadarko's traversing well would not be completed in (i.e. perforate or "bottom"), nor

would it produce minerals from Lightning's mineral estate. *Id.*

> Lightning offers no evidence that Anadarko has bottomed or opened
> a well within the Cutlass Lease, and Anadarko acknowledges that
> Lightning would have a cause of action against Anadarko (subject
> to the rule of capture) if Anadarko produced oil or gas from the
> Cutlass Lease. Hastings is distinguishable.

*Id.* As noted above, True Oil's traversing well will never be completed in, nor produce from the

Federal Tract.

    75.    As the Texas Court of Appeals explained, Lightning was not entitled to an

injunction to prevent Anadarko from drilling its traversing well because Lightning does not have

the right to exclude drilling below the surface. *Id.* at 47 (citing *Lightning Oil III*, 480 S.W.3d at 635) (holding that because Lightning does not have the right to exclude, Anadarko is not trespassing on Lightning's property and there is nothing to enjoin).

76.    As affirmed by the Texas Supreme Court, the foregoing findings, conclusions, and rationale are relevant and applicable to this matter hereunder review because the underlying material facts are very similar to those presented in this *Complaint.* (*See* ¶¶ 10–31).

77.    Just as Lightning lacks the right to exclude Anadarko from the subsurface geologic structures surrounding its leased minerals, the BLM's status as the mineral owner within the Federal Tract does not entitle it to prevent True Oil from drilling a traversing well with permission from the surface owner.

### ii.    No Mineral Trespass.

78.    As indicated above, the Texas Supreme Court rejected Lightning's subsurface trespass claim because Lightning had no interest in, ownership of, or right to control the subsurface structures. *Id.* Lighting also did not possess any right to exclude the surface owner or its lessees from use of those structures. *Id.*

79.    Having settled this initial issue, the court followed by addressing narrower questions regarding the scope of Lightning's *mineral* rights below the surface. *Id.* at 48–51. Specifically, the court considered "whether mineral owners have the right to prevent surface owners and their licensees from drilling through subsurface areas containing minerals and extracting some of those minerals during drilling operations." *Id.* at 48.

80.    After a review of the well-settled attributes of severed mineral estates and the allocation of rights, the court clarified the nature of a mineral trespass claim as it relates to the subsurface structures:

> [T]he rights conveyed by a mineral lease generally encompass the
> rights to explore, obtain, produce, and possess the minerals subject
> to the lease; they do not include the right to possess the specific place
> or space where the minerals are located. Thus, an unauthorized
> interference with the place where the minerals are located
> constitutes a trespass as to the mineral estate only if the interference
> infringes on the mineral lessee's ability to exercise its rights.

*Id.* at 49.

81.    On this premise, the court then addressed Lightning's argument that Anadarko's

proposed traversing well, if drilled, would constitute a mineral trespass. *Id.* at 48–49. In support

of mineral trespass claims and its request for an injunction, Lightning pointed to 1) potential

unauthorized interference with its ability to exercise its rights to the minerals, and 2) extraction of

minerals by Anadarko during the drilling of the traversing well. *Id.* at 49–50.

82.    First, Lightning argued that "Anadarko's proposed well sites, drilling activities, and

underground well structures will interfere with both the surface and subsurface spaces necessary

for it to exercise its right to develop the minerals in the future." *Id.* at 49. The court quickly rejected

Lightning's argument, explaining that, absent specific evidence, Lightning's claim of interference

is merely speculative. *Id.*

83.    Noting the requisite standard of proof for injunctions, the court reasoned that

"speculation is not enough. To obtain injunctive relief, Lightning must have proved that absent

such relief, it will suffer imminent, irreparable harm. It did not do so." *Id.* (citing *Butnaru v. Ford

Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002)).

84.    In support of its holding, the court outlined the established legal processes and

doctrines which are designed to facilitate each party's ability to exercise its respective property

rights, while providing adequate safeguards to prevent interference by the other party:

> First, as Anadarko and the amicus point out, the [state oil and gas
> regulatory commission] monitors, and has rules closely controlling

the location and number of wells that may be drilled on a tract of land. *See* 16 Tex. Admin. Code §§ 3.37–.39 (setting out spacing, well density, and proration and drilling units). All of these rules, and others, are aimed at efficiently producing minerals while minimizing waste and protecting the interests of the parties involved. *See Coastal Oil*, 268 S.W.3d at 15. Anadarko's drilling activities will be subject to the Commission's rules and oversight, and **Lightning points to nothing that indicates the Commission will not adequately consider and protect Lightning's rights when permitting wells and fulfilling its other duties.**

Second, Anadarko's rights are not any greater than those of Briscoe as surface owner. That is, Lightning's mineral estate remains the dominant estate. The [reasonable use/accommodation] doctrine long 'provided a sound and workable basis for resolving conflicts' between owners of mineral and surface estates that allows the mineral owner to use as much of the surface—and subsurface—as is reasonably necessary to recover its minerals. Lightning has advanced no reason that convinces us the doctrine will not be flexible enough to do so in the future.

*Id.* (emphasis added) (citations omitted); *see also* M. Kristeen Hand & Kyle R. Smith, *The Deluge: Potential Solutions to Emerging Conflicts Regarding On-Lease and Off-Lease Surface Damage Caused by Coal Bed Methane Production*, 1 WYO. L. REV. 661, 678–80 (2001) ( surmising that in an effort to afford on-lease surface owners more opportunity to use their estate, some jurisdictions have adopted an extension of the reasonable use doctrine, called the accommodation doctrine, which is a multidimensional approach that attempts to balance the rights and duties of both mineral and surface owners).

85.    Finally, Lightning argued that "Anadarko is not simply interfering with the place where Lightning's minerals are found, but asserts that Anadarko is interfering with the minerals themselves by drilling through and extracting a quantum of minerals as part of that process." *Id.* at 50.

86.    Although the court found some merit in Lightning's argument, it ultimately found in favor of Anadarko. *See Id.* at 50–51 (asserting that though the quantum of minerals displaced

and extracted by drilling activities will be small, this extraction of the mineral estate owner's interest cannot be ignored).

87.     The court explained its holding as being based on the balance of interest between the rights of the owners of the separate estates:

> Lightning's complaint is not about producing minerals. Rather, it is that Anadarko's proposed well-drilling activities will extract minerals embedded in the physical matter that will be drilled out of the ground and removed. Whether the small amount of minerals lost through that process will support a trespass action must, in the end, be answered by balancing the interests involved . . . .
>
> In balancing the relevant interests of Lightning and Anadarko, we weigh "the interests of society and the interest of the oil and gas industry as a whole against the interest of the individual operator." With respect to Lightning's interest in preventing the destruction of its minerals, Anadarko's proposed drilling activities will inevitably remove some of the minerals Lightning holds under its lease, even though that amount will be small. The amount of minerals Lightning will lose is roughly the amount of minerals embedded in fifteen cubic yards of dirt and rock for each thousand linear feet drilled with an eight-inch wellbore. And as discussed, Lightning does not have any right to the materials surrounding any such minerals—only the minerals themselves, which will be a much smaller quantity than the mass of the materials in which they are lodged.

*Id.* at 50 (quoting *Humble Oil & Ref. Co. v. West*, 508 S.W.2d 812, 816 (Tex. 1974) (citations omitted).

88.     After balancing the competing interests, the court found no actionable trespass, and ruled in favor of Anadarko. *Id.* (holding that individual interests in the oil and gas lost through being brought to the surface as part of drilling a well are outweighed by the interests of the industry as a whole and society in maximizing oil and gas recovery).

89.     In the present matter outlined herein, True Oil seeks to produce certain privately-owned fee minerals in Laramie County, Wyoming pursuant to a Wyoming state lease. In Wyoming, the Wyoming Oil and Gas Conservation Commission ("WOGCC") closely monitors

state oil and gas drilling operations, and in order to prevent waste and protect correlative rights, the WOGCC rules govern well spacing and density within drilling and spacing units, as well as setback distances from adjacent mineral tracts. *See, e.g.*, WYO. STAT. ANN. §§ 30-5-101 to -128 (2022). As such, True Oil's proposed drilling plan and production activities are subject state rules and oversight.

90.    Similarly, as the Texas court noted in *Lightning IV*, there is no indication the WOGCC would fail to adequately consider and protect the BLM's rights when permitting True Oil's wells and fulfilling its other regulatory duties, and the BLM's interests in Wyoming are further protected by the common law reasonable use/accommodation doctrine. *See Lightning Oil IV*, 520 S.W.3d at 44; *see also* ¶ 82.

**C.  True Oil is permitted to traverse the Federal Tract as a matter of law without leave from the BLM in its capacity as the regulatory body.**

91.    The U.S. Department of Interior's laws and regulations governs both the scope of the BLM's authority and sest forth guidelines instructing the BLM how to exercise its authority with respect to oil and gas development. *See generally* Bureau of Land Management, Department of the Interior, 43 C.F.R. ch. 11 (2022).

92.    The following analysis explores two official BLM documents which illustrate the scope of BLM's authority as it relates to the facts and legal questions addressed herein. *See* U.S. DEP'T OF INTERIOR, BUREAU OF LAND MGMT., IM 2020-028, MINERAL TRESPASS TO FEDERAL AND INDIAN MINERALS (June 10, 2020); Onshore Oil and Gas Order Number 1, 72 Fed. Reg. 10308 (March 7, 2007).

93.    True Oil plans to locate its well pads on private surface land and only produce fee minerals to which it has a legal interest, thus the regulation of True Oil's proposed traversing well

is beyond the scope of the BLM's authority.

94.     True Oil's surface and subsurface mineral development activities are subject to the exclusive jurisdiction of the WOGCC. Furthermore, as outline above, there is no legal basis on which the BLM can require True Oil to obtain a federal APD to drill the unperforated portion of the proposed wells that traverse the Federal Tract because True Oil's drilling plan does not pose a threat to any federal mineral interest.

### i.     *Bureau of Land Management Instructional Memorandum 2020-028*

95.     The BLM distinguishes traversing wells from trespassing wells in its Instructional Memorandum 2020-028 ("IM 2020-028") dated June 10, 2020.

96.     In IM 2020-028, the BLM defines a traversing well as "a well that **passes through Federal** or Indian **minerals** without BLM approval or knowledge, **but does not produce from those lands**, whether those lands are leased or unleased." IM 2020-028 (emphasis added).

97.     Although the BLM will have knowledge of the wells in the present case, True Oil's proposed wells otherwise fit the definition of "traversing well" provided by the BLM. *Id.*

98.     Notably, IM 2020-028 addresses mineral trespasses separately from traversing wells, and each topic has a different call to action for BLM officials. *Id.*

99.     First, IM 2020-028 clarifies the mineral trespass laws as they relate to federal mineral interest and establishes the BLM's "policy and procedures for detecting and deterring Federal . . . mineral estate trespass (mineral trespass), and the steps to take when a BLM office discovers a mineral trespass." *Id.*

100.    Second, IM 200-028 calls for data from the various solicitor's offices regarding the number and average length of wells currently traversing federal mineral estates. *Id.*

101.    According to IM 2020-028, "**A mineral trespass occurs when an operator, either**

intentionally or unintentionally, *completes and produces oil or gas* (including drill stem testing) or removes drill cores from a well in leased mineral estate where the operator has no legally recognizable interest, or from a Federal or Indian mineral estate that is unleased." *Id.* (emphasis added).

102.    In the context of federal mineral ownership, BLM regulations provide, "**extraction, severance, injury, or removal of ...** *mineral materials* from public lands under the jurisdiction of the Department of the Interior, except when authorized by law and the regulations of the Department, is an act of trespass." *Id.* (quoting Penalty for Unauthorized Removal of Material, 43 C.F.R. 9239.0-7 (2022)) (emphasis added).

103.    Because True Oil 1) *will not* perforate, nor complete any portion of the traversing well within the Federal Tract, 2) *will* comply with all rules and orders controlling setbacks, and 3) *will not* conduct drill stem testing on the Federal Tract or otherwise remove drill cores from the Federal Tract; and because the drilling of a traversing well as defined by the BLM involves no extraction of, severance of, or injury to federal mineral materials, True Oil's execution of its drilling plans does not, and cannot, constitute a mineral trespass, nor poses a risk thereof. *Id.*

104.    Although True Oil's drilling operations do not involve the removal of any type of drill core, drilling a wellbore does involve the removal of some drill *cuttings* from the portion of the geologic formation it is traversing. To the extent these drill cuttings happen to contain small amounts of mineral material from the Federal Tract, statutes and case law address this concern in the context of mineral trespass and result in the overwhelming conclusion:

> that individual interests in the oil and gas lost through being brought to the surface as part of drilling a well are outweighed by the interests of the industry as a whole and society in maximizing oil and gas recovery

and that this type of mineral removal is not actionable as a mineral trespass by the BLM. *See*

*Lightning Oil IV),* 520 S.W.3d 39, 51 (Tex. 2017); *see also* ¶ 87.

105.    Moreover, even if the removal of drill cuttings was actionable, the BLM's recovery would be nominal. In general, statutory damages for a mineral trespass are not greater than the "value of the oil taken without credit or deduction for the expense incurred by the wrongdoers in getting it." *See, e.g.* WYO. STAT. ANN. § 9239.5-2. The value of any minerals removed from the Federal Tract during the drilling process will be negligible.

106.    These circumstances overwhelmingly provide the BLM with adequate assurances that True Oil's drilling plan does not pose a risk of an actionable mineral trespass to the federal minerals within the Federal Tract.

107.    Pursuant to IM 2020-028, the BLM has the right to protect its mineral interests by evaluating the potential for mineral trespass associated with a particular traversing well by reviewing the traversing operator's drilling plans and, if applicable, completion reports to determine "whether a well is potentially in trespass, or if the drilling plan will adequately protect the traversed mineral estate." IM 2020-028.

108.    As such, it is reasonable and prudent for the BLM to track the number and average length of traversing wells by field office and review proposed "drilling plans and current, as well as any future, completion reports" in order to determine "whether a well is potentially in trespass, or if the drilling plan will adequately protect the traversed mineral estate." *See id.*

109.    However, as IM 2020-028  indicates, this cooperation represents an administrative "best practice" for protecting federal mineral interests; it does not provide nor establish the BLM the authority to approve fee surface or off-tract activities which pose no threat to any federal interests. *See id.*

    **ii.    43 C.F.R. § 3162.3-1 Drilling applications and plans; Bureau of Land Management Final Rue Onshore Oil and Gas Operations; Federal and Indian**

***Oil and Gas Leases; Onshore Oil and Gas Order Number 1, Approval of
Operations.***

110.    On March 7, 2007, the BLM published its final rule, *Onshore Oil and Gas
Operations; Federal and Indian Oil and Gas Leases; Onshore Oil and Gas Order Number 1,
Approval of Operations* ("Onshore Order No. 1"), in the Federal Register. 72 Fed. Reg. 10308
(March 7, 2007) (codified at *e.g.*, 43 C.F.R. § 3162.3-1). This Order provides "the requirements
necessary for the approval of all proposed oil and gas exploratory, development, or service wells
on all Federal. . . onshore oil and gas leases . . . " and ensures that the processing of APDs is
consistent with federal law. 72 Fed. Reg. at 10308.

111.    Importantly, Onshore Order No. 1 "clarifies the regulations and procedures that are
to be used **when operating in split estates**," ensures the APD review process involves the private
surface owner, **and requires the BLM to adhere to existing laws and legal decisions involving
split estate**. *Id.* at 10312 (emphasis added).

112.    Onshore Order No. 1 repeatedly states that the BLM must adhere to existing split
estates law as to mineral development involving federal interests. *Id.* at 10311–12, 10323, 10324.
"The final rule is consistent with existing law pertaining to split estate and the rights possessed by
the holders of outstanding leases **that limit what the BLM can do under current law**." *Id.* at
10324 (emphasis added).

113.    The BLM's rules that govern the federal APD process apply to operations intended
to recover federal minerals and/or operations on federal lands, and **the portions of Onshore Order
No. 1 that address operations in split estates applies only to operators seeking to produce
federal minerals**. *See Id.* at 10322 (emphasis added).

114.    Pursuant to 43 C.F.R. § 3160.0-5 an "Operator" is "any person or entity including
but not limited to the lessee or operating rights owner, who has stated in writing to the authorized

officer that it is responsible under the terms and conditions of the lease for the operations conducted on the leased lands or a portion thereof".

115.    Importantly, these laws and rules *do not apply to* off-tract/off-lease operators seeking to produce fee minerals from wells drilled on private surface land, nor to any traversing well that passes through federal minerals "but does not produce from those lands." *See id.*; IM 2020-028.

116.    Based on the federal definition, plus the nature and scope of True Oil's anticipated project, True Oil is not considered an "operator" for the purpose of Onshore Order No. 1, or its codification, and the laws and rules for such operators do not apply to the underlying circumstances.

## V.    CAUSE OF ACTION: DECLARATORY JUDGMENT

117.    Plaintiffs, by this reference, do hereby incorporate the preceding paragraphs of this *Complaint* as if fully set forth herein.

118.    Pursuant to 28 U.S.C.A. § 2201(a), in a case of actual controversy within the jurisdiction of this Court, an interested party may file the appropriate pleading requesting a declaration from this Court regarding the rights and other legal relations of said interested party.

119.    Upon the filing of the pleading for declaration of rights and other legal relations, this Court may declare the rights and other legal relations of the interested party, whether or not further relief is, or could be sought. *Id.*

120.    Under the federal Declaratory Judgment Act, an action for declaratory judgment "may be brought in order to resolve an actual controversy between interested parties." *Nutrasweet Co. v. Ajinomoto Co.*, 423 F. Supp. 2d 450, 453 (D. Del. 2006).

121.    Actual controversy has been further interpreted to require that every case brought

under the Declaratory Judgment Act must present a justiciable issue. *Fed. Kemper Ins. Co. v.*

*Rauscher*, 807 F.2d 345, 351 (3d Cir. 1986).

122.    The Courts have recognized one purpose of the Declaratory Judgment Act is:

> to enable a person who is reasonably at legal risk because of
> an unresolved dispute, to obtain judicial resolution of that dispute
> without having to await the commencement of legal action by the
> other side. It accommodates the practical situation wherein the
> interests of one side to the dispute may be served by delay in taking
> legal action. However, the controversy must be actual, not
> hypothetical or of uncertain prospective occurrence. The
> requirement of actual controversy encompasses concepts such as
> ripeness, standing, and the prohibition against advisory judicial
> rulings...

*Id.* at 453–54 (citing *BP Chemicals Limited v. Union Carbide Corp.*, 4 F.3d 975 (Fed.Cir.1993)).

123.    An additional purpose of the Declaratory Judgment Act is to "permit the court in

one action to define legal relationships and adjust attendant rights and obligations at issue between

parties so as to avoid dispute escalating into additional wrongful conduct, thus averting greater

damages and multiple actions and collateral issues involving not only original litigants but

potentially other third parties, and promoting utilitarian values of speed, economy, and

effectiveness." *Dow Jones & Co., Inc. v. Harrods, Ltd.*, 237 F.Supp.2d 394, S.D.N.Y.2002.

124.    To present a valid cause of action, the Federal District Courts have developed a

two-part threshold requirement:

> (1) the complaint must satisfy the elements of a statute which
> confers subject matter jurisdiction to this Court, such as 28 U.S.C. §
> 1331 or § 1332, independent of the Declaratory Judgment Act; and
> (2) Plaintiffs' complaint must present a justiciable case or
> controversy.

*Purshe Kaplan Sterling Invs., Inc. v. Neff*, No. 5:20-CV-00878, 2020 WL 5406040, at *2 (E.D. Pa.

Sept. 9, 2020), appeal dismissed sub nom; *Purshe Kaplan Sterling Investm v. Neff*, No. 20-3067,

2021 WL 1468267 (3d Cir. Mar. 12, 2021).

125.    It is established that the actual controversy or justiciability requirement amounts to "each case decided by the federal courts must be a 'case or controversy' – an action which by its nature is concrete and ripe." *Federal Kemper Ins. Co.*, 807 F.2d at 350. This requirement is further defined as follows:

> A "controversy" in this sense must be one that is appropriate for judicial determination. A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. The controversy must be definite and concrete, touching upon the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

*Id.* (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–42 (1936)).

126.    Plaintiffs satisfy the first threshold requirement based on diversity of citizenship, and the amount in controversy, pursuant to 28 U.S.C. § 1332.

127.    Based on the BLM's position asserted in its written BLM Response dated June 16, 2022, the rights and legal relations of True Oil and True Ranches, as the mineral owner and surface owner of the land and minerals associated with the drilling and spacing unit, are being improperly infringed upon, resulting in the parties having adverse legal interests. Thus, a justiciable controversy exists between Plaintiffs and Defendant satisfying the second threshold requirement.

128.    "In determining whether a court has jurisdiction to grant declaratory relief, the primary question is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Columbian Fin. Corp. v. BancInsure, Inc.*, 650 F.3d 1372, 1376 (10th Cir. 2011) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007)); *Denbury Onshore, LLC v.*

*Christensen*, 722 F. App'x 768, 779 (10th Cir. 2018).

129.    Based on the foregoing, Plaintiffs have concretely demonstrated that there currently exists a substantial controversy between them and Defendant, specifically the requirement to seek a federal APD or other BLM approval for subsurface activities not involving federal interests, and the Parties have adverse legal interest in regards to this controversy.

130.    This controversy is currently placing a complete halt on a significant portion of Plaintiff True Oil's oil and gas activity, which is True Oil's sole source of income and livelihood, and Plaintiff True Ranches' ability to lease its surface estate, and derive income therefrom. Thus, for Plaintiffs, the need to resolve this matter is urgent in nature. The sufficient immediacy of the controversy is therefore established.

131.    In order to obtain declaratory relief under Section 2201, Plaintiffs "must allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future." *Walden v. Centers for Disease Control and Prevention*, 669 F.3d 1277, 1284 (11th Cir. 2012); *Incredible Invs., LLC v. Fernandez-Rundle*, 984 F. Supp. 2d 1318, 1324 (S.D. Fla. 2013).

132.    As plead above, in the event Plaintiffs are unable to traverse the Federal Tract in accordance with its drilling plan, it will be unable to efficiently develop and produce the fee mineral within the DSU, resulting in large financial loss and hardship. Not only will Plaintiffs suffer this noted injury, they will continue to suffer injury in other matters that involve issues of surface owner rights and other split estate issues.

133.    Based on the foregoing, this matter is ripe for considering by this Court, and the Declaratory Judgment Act is the proper procedure for consideration.

# VI.    CONCLUSION

Under the foregoing existing federal and state law, non-operators such as True Oil are not required to seek federal APDs or approval for subsurface activities not involving federal interests, wherein True Oil has permission from the surface owner. Pipelines and gathering lines are built and buried all over the U.S., creating significant subsurface disturbances pursuant only to easements and surface use agreements with private surface owners. True Oil's proposed traversing wells do not threaten the federal mineral interests of the BLM, and True Oil's activities in accordance with its drilling plan are outside the BLM's jurisdiction and scope of authority.

**WHEREFORE**, pursuant to Plaintiffs' cause of action and claim for relief in the form of a Declaratory Judgment Action, Plaintiffs respectfully request this Court issue the following findings declaring the rights and legal relations of Plaintiffs' split estate ownership interests at issue in this matter, and issue a corresponding Order declaring, adjudicating and decreeing as follows:

(1) declaring the rights and other legal relations of the Plaintiffs under existing split estate common law and regulatory statutes, and

(2) declaring that it is True Oil's right to drill a traversing well through the Federal Tract belonging to the BLM without leave from the BLM, as True Ranches, the surface owner, has granted True Oil a subsurface easement to drill through True Ranches' subsurface structures to access True Oil's fee minerals within the adjacent tract.

RESPECTFULLY SUBMITTED this 26ᵗʰ day of August, 2022.

**TRUE OIL LLC, and TRUE RANCHES, LLC, Plaintiffs.**

By: _____
Scott E. Ortiz, WSB No. 5-2550
William E. Reese, WSB No. 7-4898

Alia T. Scott, WSB No. 7-5703
WILLIAMS, PORTER, DAY, & NEVILLE, P.C.
PO Box 10700
Casper, WY 82602
Phone:          307-265-0700
Fax:            307-266-2306
Email:          sortiz@wpdn.net
                wreese@wpdn.net
                ascott@wpdn.net