IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

TRUE OIL LLC, a Wyoming Limited
Liability Company, and TRUE
RANCHES LLC, a Wyoming Limited
Liability Company,

          Petitioners,

vs.

BUREAU OF LAND MANAGEMENT,
et al.,

          Respondents.

Case No.  2:22-CV-188-KHR

## ORDER ON APPEAL OF FINAL AGENCY ACTION

Before the Court is a property dispute between True Oil LLC and True Ranches LLC (Petitioners) and the Bureau of Land Management and various federal officials (Respondents) involving a split estate determination. On February 13, 2023, this Court found it had jurisdiction to hear the present claims and denied Respondents' Motion to Dismiss. (ECF No. 22). The parties have now briefed the merits of the case and the Court heard oral arguments on September 21, 2023. After reviewing the briefing, relevant law, and hearing argument, the Court finds judgment should be entered in favor of Respondents for the reasons discussed herein.

## BACKGROUND

Petitioners True Oil and True Ranches are limited liability companies organized under the laws of the state of Wyoming. (ECF No. 6, at 2). True Oil owns the minerals under Section 10: NW4 and S/2 in Laramie County, Wyoming. *Id.* True Ranches owns the surface estate overlaying all of Section 10 and Section 15: Lots 1-4, N2S2, N2, T12N, and R65W in Laramie County, Wyoming. *Id.* at 2–3.

Respondents are the Bureau of Land Management ("BLM") and various federal officials whose duties encompass the regulation of federal lands and/or minerals. *Id.* at 3. The BLM manages a 160 acre tract of federal minerals (the "federal tract") associated with federal lease WYW-186666 located under Section 10: NE4 in Laramie County, Wyoming. *Id.*

When considering these interests together, True Ranches owns the surface rights to land while the BLM manages the mineral rights. This ownership structure creates different rights in the same geographical area and the issue the Court is presented with. True Oil plans to begin drilling operations on Section 10: NW4, S2 and Section 15: Lots 1-4. N2S2, N2, T12N, and R65W.[1] *Id.* at 5. As part of their plan, True Oil intends to build four horizontal wells as part of its drilling and spacing unit ("DSU"). *Id.* "One or two of these horizontal wells" will be required to traverse the subsurface formation of the federal tract to which True Ranches owns the surface estate. *Id.*

---

[1] True Oil owns the mineral rights to referenced areas in Section 10. Cowboy Land, LLC owns the mineral rights to referenced areas under Section 15 and has leased those to Anadarko Oil and Gas 5, LLC. It is unclear what relationship Anadarko and True Oil have.

To effectuate this plan, Petitioners filed for an application for permit to drill ("APD") with the Wyoming Oil and Gas Conservation Commission ("WOGCC"). *Id.* Petitioners later learned that the federal tract was subject to litigation, Plaintiffs contacted the relevant BLM field offices to notify the agency of its intent to traverse the federal tract. *Id.* at 6. After discussion, the Rawlins BLM Field Office told Petitioners it would be required to first obtain a federal APD before traversing the federal tract.[2] *Id.* at 7. Petitioners disagreed and provided a legal memorandum with their argument. *Id.* John Elliott, the acting Rawlins Field Manager, issued a written response after considering the memorandum and further discussions. *Id.* at 7–8. Mr. Elliott stated the BLM "cannot authorize the request to traverse WYW-186666 if the traversing borehole could be considered to provide for subsequent development of the lease unless Judge Morris has approved such activity pursuant to a filed motion." *Id.* at 8; (ECF No. 6-4, at 2).

Part of the reasoning for Respondents' decision was due to ongoing litigation in Montana involving the federal tracts. The leases for those tracts were sold in a December 2017 oil and gas lease sale. (ECF No. 13-2, at 1). Those sales were challenged by environmental groups for not complying with federal law in two separate cases in the U.S. District Court for the District of Montana. In one, the court remanded the sale for further NEPA analysis but did not vacate the sale. *Id.* In the other, the leases were vacated because the court found the BLM had failed to meet the prioritization objective for sage grouse habitat protection as required by the BLM's 2015 plans. *Id.* The vacatur was stayed pending

---

[2] A position Respondents maintained at the hearing on January 20, 2023, and at oral argument on September 21, 2023.

the resolution of an appeal. *Id.* However, the court's order prohibited any work to develop the leases or to obtain production while the appeal is pending. *Id.*

Petitioners subsequently initiated this suit and, before filing their Amended Complaint, had another conversation with the Wyoming BLM Office. (ECF No. 6, at 9). There, the BLM expressed the position that a federal APD would be required to traverse any federal minerals in a split estate. *Id.* Additionally, the BLM expressed that if Petitioners attempted to traverse without a federal APD, it would take all legal action available to it—including civil or criminal penalties. *Id.* at 10.

## RULING OF THE COURT

### I. Final Agency Action

To begin, the Court will readdress the question of final agency action Respondents argued in their Motion to Dismiss and renewed in the present briefing. In the Order Denying Respondents' Motion to Dismiss, the Court explained that the BLM's requirement for Petitioners to file for a federal APD is final agency action because it is a property right determination. (ECF No. 22)

As stated in the Order on the Motion to Dismiss, an action brought under the APA requires "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704; *e.g. Wyoming v. U.S. Dept. of Interior*, 360 F. Supp. 2d 1214, 1227 (D. Wyo. 2005). Agency action is defined as "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13); 5 U.S.C. § 701(b)(2). To be final, "the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature.

4

Second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Center for Native Ecosystems v. Cables*, 509 F.3d 1310, 1329 (10th Cir. 2007) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).

Finality has been interpreted in a pragmatic way. *Id.* "If an agency has issued a 'definitive statement of its position, determining the rights and obligations of the parties,' the agency's action is final notwithstanding '[t]he possibility of further proceedings in the agency' on related issues, so long as 'judicial review at the time [would not] disrupt the administrative process.'" *Id.* (quoting *Bell v. New Jersey*, 461 U.S. 773, 779–80 (1983)) (alterations in original); *see also Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970) ("the relevant considerations in determining finality are whether the process of administrative decisionmaking has reached a stage where judicial review will not disrupt the orderly process of adjudication and whether rights or obligations have been determined or legal consequences will flow from the agency action").

Respondents continue to contort the issue of final agency action in their briefing and at oral argument. In their brief, Respondents argue "[f]iling an APD is a procedural mechanism that allows BLM to manage federal minerals and is a means of obtaining BLM's consent to drill through federal minerals. Therefore, direction from BLM to file an APD to obtain consent to drill a well that traverses through federal minerals does not mark the completion of BLM's decision making process or assign rights or obligations to any party." (ECF No. 35, at 9).

The flaw is the assumption Respondents make. Requiring an APD is not simply a procedural mechanism, but a property rights determination. That is because it regulates the rights Petitioners argue belong to the surface estate owner. It is not merely procedural because it places additional obligations on the asserted owner of the interest. Respondents have enforced the requirement from the viewpoint that no well, productive or not, can pass through federal minerals without their consent. If property rights are a bundle of sticks, Respondents have taken a stick and added to their pile that Petitioners argue belong in theirs.

Correctness of the decision aside, the unilateral determination has altered the balance of the property interests of the parties. From the Petitioners' viewpoint, Respondents have obstructed a right inherent to their rights as the surface owner. From Respondents' viewpoint, Petitioners have threatened their mineral interest with the proposed traversing well and has attempted to protect those rights. Both views are reasonable under the circumstances, yet only one can be correct.

The present situation is emblematic of why finality is interpreted in a pragmatic way. *Center for Native Ecosystems*, 509 F.3d at 1329 (10th Cir. 2007). The APD, while reasonable from Respondents' viewpoint, is a definitive statement; that is, the right to build a traversing well belongs to the mineral interest owner. The only recourse Petitioners have is judicial review. While this may not be the typical final agency action reviewed under the APA, it is nonetheless final because of the definitive position on split estate rights Respondents have taken. Once the BLM required Petitioners to file for a federal APD, that

position was enforced on outside parties and final for purposes of judicial review under the APA.

## II. Standard of Review

There are six circumstances where a reviewing court will hold unlawful and set aside agency action. 5 U.S.C. § 706. As briefed by parties, Petitioners claim that Respondents' actions were "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Generally, a Court will conduct a § 706(2)(C) analysis using the *Chevron* test. *See WildEarth Guardians v. U.S. Fish and Wildlife Service*, 784 F.3d 677, 683 (10th Cir. 2015) ("If it is otherwise appropriate, we apply the test established by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), when asking whether an agency has acted within its authority."). That test first requires a court to determine "'whether Congress has directly spoken to the precise question at issue.'" *Id.* at 684 (quoting *Chevron*, 467 U.S. at 842). If Congress has, the inquiry ends and a court does as instructed by Congress. *Id.* If "'the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.'" *Id.* (quoting *Chevron*, 467 U.S. at 843).

Most cases seeking review under § 706(2)(C) concern an agency's interpretation of some statute or other obligation. When doing so, a court should afford deference to the agency's interpretation of the statutes committed to the agency to administer. *Chevron*, 467 U.S. at 844 ("We have long recognized that considerable weight should be accorded to an

7

executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations.").

However, this does not appear to be so simple. Here, Respondents requirement for a federal APD diverges from mere statutory interpretation to a determination of property rights in the split estate context. The Court should not afford deference for those determinations.[3] The proper framework in this context is for the Court to determine the validity of Respondents' decision. Who the right to build a traversing well belongs to will determine whether Respondents have acted in excess of their authority. If that right belongs to the United States, the Court will then follow a traditional analysis.

### III. The Stock Raising Homestead Act

Particularly at issue here is the governing law. Petitioners brief the issue using Wyoming law and reference a Texas line of cases as persuasive authority. Respondents primarily argue the BLM has authority to require Petitioners to file for a federal APD under the Mineral Leasing Act ("MLA") and existing regulations. Turning to split estate law, Respondents cite to Wyoming caselaw arguing the mineral estate is dominant.

In passing, Respondents note that Petitioners' main argument relies on Texas cases that do not involve federal minerals. (ECF No. 35, at 15). The significance of that is not the fact there are federal minerals, but how the split estate here came to be. What neither

---

[3] This is because the legal issue lies in the basis of the split estate determination, not the enforcement. If the right to regulate the subsurface of a split estate does not belong to the mineral interest owner, any regulation to that effect would not be within Respondents' authority. To properly adjudicate the issues here, the Court must define the property rights of the parties.

side considers is the effect of the Stock Raising Homestead Act ("SRHA") on the property at issue.[4]

After various difficulties with prior federal land grants, Congress passed the SRHA in 1916. *Watt v. Western Nuclear, Inc.*, 462 U.S. 36, 46–51 (1983).[5] Through the SRHA, a person could obtain ownership of 640 surface acres. Matt Micheli, *Showdown at the OK Corral—Wyoming's Challenge to U.S. Supremacy on Federal Split Estate Lands*, 6 Wyo. L. Rev. 31, 32 (2006). Learning from the prior difficulties, the SRHA also included an encompassing provision that retained the United States' mineral interest beneath the surface estates. *Id.* at 32–33; *Western Nuclear*, 462 U.S. at 50–51; 43 U.S.C. § 299(a). Specifically, it states "[a]ll entries made and patents issued under the provisions of this subchapter shall be subject to and contain a reservation to the United States of all the coal and other minerals in the lands so entered and patented, together with the right to prospect for, mine, and remove the same." 43 U.S.C. § 299(a).

"Congress' purpose in severing the surface estate from the mineral estate was to encourage the concurrent development of both the surface and subsurface of SRHA lands." *Western Nuclear*, 462 U.S. at 50. That reservation "preserve[d] incentives for the discovery and exploitation of minerals in SRHA lands." *Id.* What remains unclear, is the extent of what rights the United States retained after granting lands through the SRHA. The

---

[4] The Court raised the applicability of the SRHA at Oral Argument and the parties later stipulated to the addition of the land patent granted under the SRHA for the surface estate here. In any event, it is the Court's function to decide all questions of law. *See Jones v. U.S.*, 526 U.S. 227, 247 n.8 (1999) ("The principle that the jury were the judges of fact and the judges the deciders of law was stated as an established principle as early as 1628 ...."). Because the parties have stipulated to the land patent demonstrating the surface estate was granted under the SRHA, its scope is purely legal and for the Court to determine.
[5] For a thorough discussion of the history leading to the passing of the SRHA, see *Western Nuclear*, 462 U.S. at 46–51.

threshold question then is whether the reserved rights are specific to minerals and extraction, or if those rights extend to all subsurface geologic formations?

As the act states, "all the coal and other minerals" are retained by the United States. 43 U.S.C. § 299. The serial patent granting the land at issue mirrors that same language. (AR Supp_9-25-23). It is important to keep in mind "'the established rule that land grants are construed favorably to the Government, that nothing passes except what is conveyed in clear language, and that if there are doubts they are resolved for the Government, not against it.'" *Western Nuclear*, 462 U.S. at 59 (quoting *United States v. Union Pacific R. Co.*, 353 U.S. 112, 116 (1957)).

Looking to the language of the SRHA and the serial patent granting the land at issue, one phrase stands out. The United States retained "coal and other minerals *in the lands* so entered and patented" 43 U.S.C. § 299(a); (AR Supp_9-25-23). From this wording, it appears only the "minerals" within the ground are reserved to the United States, not everything under the surface.

Yet, the purpose of the SRHA gives this Court pause to jump to a quick conclusion. "Congress plainly expected that the surface of SRHA lands would be used for stock-raising and raising crops." *Western Nuclear*, 462 U.S. at 53. On that basis, would it be inconsistent for the surface owner to have any subsurface rights? This Court thinks not.

First, the SRHA reserves only "coal and other minerals" to the United States. Certainly, the government is afforded considerable deference in the construction of land grants. *Union Pacific R. Co.*, 353 U.S. at 116. However, if the United States intended to

retain the entire subsurface, the SRHA should say so.[6] This Court cannot expand minerals to mean everything beneath the surface. Second, the SRHA does not limit the activities of the surface owner to only ranching and farming. Rather, it bestowed "the tract of Land above described; TO HAVE AND TO HOLD the said tract of Land, with the appurtenances thereof, unto the said claimant and to the heirs and assigns of the said claimant forever." (AR Supp_9-25-23).[7] The only limitations placed were for water and mineral rights, not any restrictions on land use.[8] *Id.* Certainly, Congress could have placed those limitations if it desired. *See Union Pacific R. Co.*, 353 U.S. at 114 ("On the face of the Act it would seem that the use of the words 'the right of way' describes a lesser interest than the grant of 'public land.' Moreover, this right of way was granted [to] Union Pacific 'for the construction of said railroad and telegraph line.' That purpose is not fulfilled when the right of way is used for other purposes." (internal citations omitted)). Third, if the entire subsurface was reserved to the United States, there would be no need for the extensive caselaw analyzing what constitutes a mineral for SRHA purposes.

Prior caselaw buttresses these points. In *Watt v. Western Nuclear, Inc.*, the U.S. Supreme Court thoroughly analyzed the SRHA and what the term "minerals" included. 462 U.S. 36 (1983). The direct issue there was if "minerals" encompassed gravel culminating with a four-part test. *Id.* at 37–38, 53. "Given Congress' understanding that

---

[6] In *Union Pacific R. Co.*, the U.S. Supreme Court found that the United States' reservation of "mineral lands" in a right of way granted to Union Pacific Railroad Company encompassed "mineral rights." That construction runs far short of prohibiting any subsurface intrusion.
[7] The citation here is to the serial patent granting the surface estate at issue in this case. Other patents may contain different language.
[8] It would be an illogical result if an heir to a SRHA surface estate was limited to ranching and farming. If any other use led to a reversion of the interest, there is no telling the amount of land that could be divested from the present owner.

11

the surface of SRHA lands would be used for ranching and farming, we interpret the mineral reservation in the Act to include substances that are mineral in character (i.e., that are inorganic), that can be removed from the soil, that can be used for commercial purposes, and that there is no reason to suppose were intended to be included in the surface estate." *Id.* at 53. Ultimately, the Court did find gravel was a mineral and an interest the United States retained. *Id.* at 56.

The significance of the test is two-fold. First, is that a mineral must be a substance "that can be removed from soil." *Id.* at 53. By the test's own language, the soil belongs to the surface estate because the Court distinguished minerals from the soil. Second, the test focuses on extraction and commercial value. Minerals must be some resource that is pulled from the ground, not everything within the ground itself.[9] Justice Powell's Dissent in *Western Nuclear* goes a step further and states:

> Quite apart from the clear evidence of congressional intent at the time SRHA was enacted in 1916, see Part I, supra, *it is unreasonable to suppose that Congress ever intended—when it was enacting legislation to encourage settlement of the West—to reserve to the Federal Government the commonplace inorganic substances that actually constituted the soil of the patented land*. The incentive to move to the West and settle on its semiarid land would have been diminished significantly if it had been understood that only limited rights in what most persons consider a part of the soil itself were being granted. Indeed, the legislative history is clear that, rather than intending to provide rights analogous to grazing leases upon the unappropriated public domain, Congress intended to promote permanent settlement. *See* 53 Cong. Rec. 1233–1234 (1916) (statement of Congressman Mondell) ("I wish [the Congressman] would not call the laws he refers to surface-entry laws, for they are not. They convey fee titles. They give the owner much more than the surface; they give him all except the body of the reserved mineral").

---

[9] Without some sort of extraction of a resource, the *Western Nuclear* test is likely inapplicable because there is no removal of a substance from the ground. The test inherently contemplates some usage or taking.

*Id.* at 71 n.18 (5-4 decision) (Powell, J., dissenting) (emphasis added). Considering the majority's analysis, Justice Powell's Dissent, and the extensive caselaw relying on *Western Nuclear*,[10] the SRHA reserves only extractable minerals to the United States, not the entirety of the soil beneath the surface.[11]

**IV. Requiring an APD Does Not Exceed the BLM's Statutory Authority**

Determining the boundaries of the SHRA's mineral reservation is only the first step. While the SRHA does not reserve everything below the surface to the United States, a traversing well could nevertheless be prohibited. That dilemma again is controlled by federal law, not state law as briefed by the parties.

"The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. CONST. art. IV, § 3, cl. 2. Clearly, the mineral interest here is owned by the United States. As such, the United States has the authority to regulate and protect those lands.[12] *See id.*; *U.S. v. City and County of San Francisco*, 310 U.S. 16, 29–30 (1940) ("The power over

---

[10] *Western Nuclear* is the foundational case in which many Tenth Circuit cases have relied in determining what constitutes a mineral. *See, e.g., Sunrise Valley, LLC v. Kempthorne*, 528 F.3d 1251, 1258 (10th Cir. 2008) (finding that *Western Nuclear* governs SRHA cases and the United States' mineral reservation in the SRHA includes sand, gravel, and rock); *Hughes v. MWCA, Inc.*, 12 Fed. App'x 875, 876–77 (10th Cir. 2001) (relying on *Western Nuclear* in holding scoria is a mineral under the SRHA).

[11] The Court also takes note of *Rosette Inc. v. U.S.*, 277 F.3d 1222 (10th Cir. 2002) (cert. denied). There, the Tenth Circuit "conclude[d] that geothermal resources in general are in fact 'minerals' under the SRHA." *Id.* at 1230. The court reasoned that the process as a whole is mineral in nature, i.e., that magma heats water in porous rock structures. *Id.* at 1228. ("There is no question that both magma and rock are inorganic in character."). That expanded reasoning hints to a broader conception of minerals. However, there is still extraction of a resource from the ground which is not the case here.

[12] The applicability of the Property Clause, while not briefed by the parties, again is a question of law for the Court to determine. *See Jones*, 526 U.S. at 247 n.8 (1999) ("The principle that the jury were the judges of fact and the judges the deciders of law was stated as an established principle as early as 1628 ...."). A court cannot be constrained to the legal issues as briefed by the parties when it would lead to an erroneous result.

the public land thus entrusted to Congress is without limitations. And it is not for the courts to say how that trust shall be administered. That it for Congress to determine.").

The threshold question then is whether Congress would have the power to require a federal APD in these circumstances. If Congress would, then the Court must determine if that power has been delegated. If it does not, the Court must ascertain Wyoming's law on this issue.

**A. Congress has the power to protect mineral interests retained by the SRHA**

The extent of Congress' regulatory authority extends deep. "[T]he Property Clause gives Congress the power over the public lands 'to control their occupancy and use, to protect them from trespass and injury, and to prescribe the conditions upon which others may obtain rights in them.'" *Kleppe v. New Mexico*, 426 U.S. 529, 540 (1976) (quoting *Utah Power & Light Co. v. United States*, 243 U.S. 389, 405 (1917). It is a "complete power" over the property entrusted to Congress. *Id.* That includes federal lands located within a state such as Wyoming. *Utah Power & Light Co.*, 243 U.S. at 405. Thus, regardless of what Wyoming law may allow, it cedes to federal law in these circumstances.

Based on the Supreme Court precedent, there are two main reasons why Congress has the power to prohibit a traversing well on SRHA lands. The first stems from how the surface estate came into private hands—the SRHA. Before the lands were granted, the United States had total ownership of land and underlying minerals. The surface of the land was then separated from the minerals through the SRHA and granting of a Patent. In granting the surface estate, this Court is skeptical Congress would relinquish its ability to protect the United States' property interest below the surface. Rather, the history of fraud

14

in prior federal land grants and retention of all minerals signifies Congress' intent to protect the United States' mineral interest. *Western Nuclear*, 462 U.S. at 46–50. Additionally, having no protection of mineral interests would jeopardize Congress' goal of exploration and development of mineral resources. *Id.* at 50, 52 ("Congress intended to facilitate development of both surface and subsurface resources, the determination of whether a particular substance is included in the surface estate or the mineral estate should be made in light of the use of the surface estate that Congress contemplated.").

While it is a stretch to assume Congress intended to retain the entirety of the subsurface, it is quite reasonable to assume Congress retained a robust ability to protect its mineral interests through various means. *See id.* ("'the established rule that land grants are construed favorably to the Government, that nothing passes except what is conveyed in clear language, and that if there are doubts they are resolved for the Government, not against it.'" (quoting *Union Pacific R. Co.*, 353 U.S. at 116)). That ability would include some restrictions on subsurface activity by the surface owner if meant to protect the United States' mineral interest.

Second, even if Congress did not retain the ability to regulate non-extracting subsurface activity in the SRHA, the Property Clause nevertheless permits Congress to infringe on private property rights to protect federal property interests.[13] *Camfield v. U.S.* is instructive. 167 U.S. 518 (1897). There the U.S. Supreme Court upheld a federal law that prohibited private persons from constructing fences that would enclose federal land,

---

[13] This statement assumes that under ordinary circumstances, the right to build a traversing well would belong to the surface owner. The Court is not making any such determination and is only assuming so for the sake of Petitioners' argument.

even if those fences were constructed on private property. *Id.* at 525–26. The Court reasoned in part "[t]he inconvenience, or even damage, to the individual proprietor does not authorize an act which is in its nature a purpresture of government lands." *Id.* at 525. While not unlimited, the Court made clear Congress can intrude on private property interests to protect its own. *Id.* ("The general government doubtless has a power over its own property analogous to the police power of the several states, and the extent to which it may go in the exercise of such power is measured by the exigencies of the particular case.").

Nearly one hundred years later the U.S. Supreme Court stood by the *Camfield* ruling and acknowledged "the scope of congressional power to regulate conduct on private land that affects the public lands." *Kleppe*, 426 U.S. at 538 ("*Camfield* holds that the Property Clause is broad enough to permit federal regulation of fences built on private land adjoining public land when the regulation is for the protection of the federal property.").

### B. Requiring an APD is within the BLM's power

With the threshold question answered affirmatively, the Court turns to whether that power was delegated. The MLA governs minerals that were reserved under the SRHA. 30 U.S.C. § 182. "The purpose of the Act is to promote the orderly development of oil and gas deposits in publicly owned lands of the United States through private enterprise." *Geosearch, Inc. v. Andrus*, 508 F. Supp. 839, 842 (D. Wyo. 1981) (citing *Harvey v. Udall*, 384 F.2d 883 (10th Cir. 1967)). To administer the MLA, Congress delegated broad authority. "The Secretary of the Interior is authorized to prescribe necessary and proper

rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of this chapter." 30 U.S.C. § 189.

Based on that broad grant of authority, it is clear the Secretary has the power to protect the United States' mineral interests. *Best v. Humboldt Placer Min. Co.*, 371 U.S. 334, 336 (1963) ("the Department has been granted plenary authority over the administration of public lands, including mineral lands; and it has been given broad authority to issue regulations concerning them."). Contrary to Petitioners' argument, the APD requirement does serve the purpose of the MLA. The federal lands at issue is the United States' mineral interest. Additionally, as explained above, Congress retained the ability to protect the mineral interests through the SRHA. Even if regulatory authority wasn't retained, the Property Clause permits Congress to infringe on private property to protect federal property.

Petitioners are considered an operator for purposes of 43 C.F.R. §§ 3160.05 & 3162.3-1. As argued by Respondents, an operator includes a person conducting operations on federal land. "[P]rovided an agency's interpretation of its own regulations does not violate the Constitution or a federal statute, it must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *HRI, Inc. v. E.P.A.*, 198 F.3d 1224, 1241 (10th Cir. 2000) (quoting *Stinson v. United States*, 508 U.S. 36, 45 (1993)). "The objective of the regulations [in subpart 3160] is to promote the orderly and efficient exploration, development and production of oil and gas." 43 C.F.R. § 3160.0-4. Respondents' interpretation is consistent with that purpose and in accordance with the laws

of the United States. U.S. CONST. art. IV, § 3, cl. 2.; *Camfield*, 167 U.S. at 525–26; *Kleppe*, 426 U.S. at 53—41.

Regardless if there is a specific regulation on point, it is well within the BLM's authority to regulate subsurface activity that could hinder or threaten its mineral interest. The BLM also possesses broad authority to prosecute trespass. 43 C.F.R. § 9239.0-3 *et seq.* Due to the SRHA's expansive mineral reservation and the power afforded to the United States under the Property Clause, a traversing well would likely constitute trespass. Trespass is "the unlawful use of, or injury to, property of the United States." 43 C.F.R. § 9239.0-9(a). A traversing well could not only potentially go through federal minerals, but also injure the United States' ability to protect its minerals.[14]

From this Court's perspective, it is not unreasonable for the BLM to require a surface owner to apply for a federal APD before constructing a traversing well so it may monitor and protect the United States' mineral interests. That requirement is not a complete prohibition on traversing wells. Instead, it provides the BLM notice of underground activities in productive mineral zones and the ability to protect future mining activities. *See Camfield*, 167 U.S. at 525 ("The general government doubtless has a power over its own property analogous to the police power of the several states, and the extent to which it may go in the exercise of such power is measured by the exigencies of the particular case.").

---

[14] It is important to keep in mind the SRHA has an expansive definition of minerals here. That broad definition leaves more in the ground that could be injured by unregulated activity.

CONCLUSION

The unique circumstances here require this ruling. The split estate here is not one of private conveyance, but a creature of federal statute. That comes with different hurdles for Petitioners that were not fully appreciated in their briefing.[15] The SRHA's mineral reservation is encompassing. So extensive that it includes steam created through magma heating rock and water. *Rosette Inc.*, 277 F.3d at 1230. Additionally, Petitioners are on unequal footing with the United States as a result of the land grant. Not only are land grants construed in favor of the government, but the Property Clause permits the United States to regulate private property to protect its own.

Further, policy considerations warrant caution in the United States' favor. "The federal government owns the mineral rights on 11 million acres of the nearly 12 million acres of split estate lands in Wyoming." Matt Micheli, *Showdown at the OK Corral—Wyoming's Challenge to U.S. Supremacy on Federal Split Estate Lands*, 6 Wyo. L. Rev. 31, 33 (2006). If the surface owners on those 12 million acres could permit subsurface activity, without notice to the federal government, millions of acres of public resources could be endangered. Setting aside the risk of unpermitted extraction of federal minerals, the location and amount of traversing wells could jeopardize future extraction for those sites. The BLM needs notice and regulatory authority so it may protect the United States' interests and preserve minerals for future extraction.

---

[15] Had Wyoming law applied, there likely would have been a different outcome here. Wyoming Statute § 34-1-152 reserves the underground pore space to the surface owner unless otherwise agreed. Neither party briefed or noticed the Court of this statute, but it is highly persuasive that a surface owner has the right to construct a traversing well under Wyoming law.

For the above stated reasons, the Court finds the BLM acted within its scope of authority and declares the BLM, as designated by Congress, is permitted to regulate subsurface activity in protection of federal minerals as it did here.

Dated this 30th day of October, 2023.

_____
Kelly H. Rankin
United States Magistrate Judge